LAURIE WILLSON, Plaintiff-Appellant, *v.* DONALD PEPICH *et al.*, Defendants-Appellees.

Second District No. 82—989

Opinion filed November 15, 1983.

Lester E. Munson, Jr., of Smith & Munson, Ltd., of Wheaton, for appellant.

Kenneth L. Popejoy, of Huck & Walsh, of Wheaton, for appellees.

JUSTICE VAN DEUSEN delivered the opinion of the court:

Plaintiff, Laurie Willson, filed suit against her landlords, Donald and Patricia Pepich, seeking damages for injuries resulting from a fall in the common area outside of their apartment building. The trial court submitted the case to the jury on the issues of comparative negligence, proximate cause and damages. The jury returned its verdict in favor of defendants and against plaintiff. Plaintiff's post-trial motion was denied, and plaintiff has appealed the judgment entered on the verdict in favor of defendants and the denial of her post-trial motion.

Plaintiff, Laurie Willson, shared an apartment with another woman in a two-unit apartment building owned by defendants Donald and Patricia Pepich under a lease beginning in November 1978. With the landlord's permission, she had moved into the apartment 10 to 14 days prior to November 1. On November 4, 1978, plaintiff testified, she fell in the front yard of the building. She said she was walking along a worn path between the driveway and the sidewalk when her foot teetered on something and went off, at which time she fell and felt pain in

her ankle. In the apartment, it started to swell, and she put ice on it. In the first part of January she sought medical help. In the summer she saw another doctor, who informed her that the bone was fractured and referred her to a specialist. At the time of trial the left ankle was larger than the right, the heel was hard to the touch, and she could not rise upon the toes of that foot. She testified she was quite active on that foot and was employed driving rental trucks prior to the fall.

On cross-examination, she admitted that she was receiving Social Security disability payments for low blood pressure at and three years prior to the fall. The condition caused lightheadedness or dizziness when she stood from a sitting position, which, she said on redirect, was under control for three months prior to the fall. She said she had no numbness but did have some pain and aches in her legs in that three-year period. She also admitted that, as a diabetic, she had decreased feeling in her legs but had testified on direct that she had no dizziness, blackouts, pain, numbness or vision problems as a result of her diabetes in the three months preceding and following the fall. On the day of her fall, she walked along a path she had walked several times before, was looking down on the ground ahead of her that had dirt, rocks and bumps, teetered on something loose that she was unable to identify, fell and got up and went into the house.

Dr. Kelikian, a treating orthopedic surgeon testified that he first saw plaintiff on September 10, 1979, that she had a crushing of the calcaneus (apparently a smashing of an ankle bone into the heel bone) at that time, and that such injuries are generally trauma-initiated. He said diabetes aggravates such a fracture, and he opined that her condition will not improve and the foot will eventually be amputated. On cross-examination, he stated that he had no way of knowing when the bone was fractured, that the damages he saw in September 1979 could have been increased or worsened by the patient's walking on the fractured bone, that an operation could have been done when the fracture was less crumbled, or even at the time of trial, but that diabetics do not heal well and he would not operate because of the diabetes.

Defendant Donald Pepich testified that he and his son did routine maintenance and yard work on the property. He said that the area of the yard between the driveway and the sidewalk was green grass like the rest of the yard and that there was no worn pathway there. He contradicted the testimony of plaintiff and her roommate that he was promptly informed of the fall.

Kenneth Ferestad, next door neighbor and friend of defendant Donald Pepich, testified that they had agreed to watch each other's property. Until June 1982, the witness testified, he saw the Pepich

property every few days and went to the property about once every three to four months. He could not say how many times he observed defendant and his son working on the lawn, and he could not say what the condition of the front yard was in the first week of November 1978. After questioning by defense counsel and the court, and over plaintiff's objections, the witness finally stated he was on the property in fall 1978 and that the area between the gravel driveway and the sidewalk was just grass with no worn areas. Plaintiff's counsel continually objected to the witness' testimony on that subject because it did not specifically pertain to the first week of November, and, on cross-examination, the witness stated that he "would be lying" if he attempted to describe the condition of defendants' front yard at that specific time.

Defendants' last witness, a treating physician, testified that he had treated plaintiff for diabetes since 1971. Over plaintiff's continuing objection, he was allowed to testify regarding plaintiff's diabetic symptoms over the entire course of treatment. Specifically, he said that in 1975 plaintiff had numbness, tingling and pain in both legs and that such a condition can result in imbalance, dizziness or blacking out. He went on to say that those conditions continued throughout her treatment, that she had good times and bad times regarding those conditions, and that they will continue to exist in plaintiff. He said that in 1976 the low blood pressure condition (dizziness in rising from a sitting position or vice versa) began, it was severe in 1976-77, and it is likely to continue in the future. Regarding the November 4, 1978, injury, the doctor said the injury would not aggravate or accentuate plaintiff's diabetes, the diabetes would slow down her healing process, and diabetics can undergo successful surgery for minor, compared to extensive, fractures.

On cross-examination he testified that plaintiff's diabetes was "fairly well controlled" in August 1978 so that she could perform her job as a truck driver, that he did not see her again until February 1979, and that she did customarily see him if her diabetes was moving out of control. Regarding the postural hypotension (low blood pressure), he testified that he recorded in his notes that plaintiff had "[n]o difficulty with postural hypotension" at her August 1978 visit. On redirect, he stated it was possible for plaintiff to have had dizziness and imbalance between her August 1978 and February 1979 visits, but a defense objection was sustained to the question on recross as to whether it was probable inasmuch as she did not come to see him about those problems during that time.

Plaintiff first contends on appeal that the trial court improperly instructed the jury on the meaning of proximate cause. More spe-

cifically, she asserts that the trial court erred in giving defendants' instruction No. 13 rather than plaintiff's instruction No. 11. Both of these instructions are versions of Illinois Pattern Jury Instruction (IPI), Civil, No. 15.01 (2d ed. 1971) ("Proximate Cause-Definition").

IPI Civil No. 15.01 reads as follows:

> "When I use the expression 'proximate cause', I mean [that] [a] [any] cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

Defendants' instruction No. 13 read as follows:

> "When I use the expression 'proximate cause', I mean a cause which, in natural or probable sequence, produced the injury complained of."

Plaintiff's instruction No. 11 included the bracketed material contained in the last two sentences of the pattern instruction and read as follows:

> "When I use the expression 'proximate cause', I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

Plaintiff's basic argument is that the phrase "a cause" in defendants' instruction No. 13 limited the jury charge to one of a singular cause and that pure form comparative negligence principles require that two causes be considered—plaintiff's conduct and defendants' conduct. She also strongly urges that we place our blessing on her version of IPI Civil No. 15.01 which, as shown above, was couched in terms of "any cause" in the first sentence and also included the last two sentences contained in the bracketed material in IPI Civil No. 15.01, which she asserts makes clear that there can be more than one concurring or contributing cause of plaintiff's injury.

We agree that the principal reason for not permitting the inclusion of the bracketed material in IPI Civil No. 15.01 is no longer present under the doctrine of comparative negligence. So long as the doctrine of contributory negligence was a viable doctrine in this State, the negligence of the defendant had to be the sole cause of the injury to the plaintiff when the only other possible contributing cause was the conduct of the plaintiff herself, and it was for this reason that the bracketed material was held to be improper in such cases. (See *Budovic v. Eschbach* (1953), 349 Ill. App. 163, 167.) On the other hand, it is equally

clear that the bracketed material containing the last two sentences was included in IPI Civil No. 15.01 to address the situations where there was evidence that something or acts of someone other than the negligence of the parties was also a possible proximate cause of the injury. (See *Perry v. Chicago & North Western Transportation Co.* (1977), 54 Ill. App. 3d 82, 91.) In the absence of such evidence, we agree with the trial court that the additional language contained in the last two sentences can be confusing. We find no error in the trial court's refusal to give plaintiff's version of IPI Civil No. 15.01 under the circumstances of this case and in view of the instructions which were given.

■■ We turn then to the issue of whether or not the giving of defendants' instruction No. 13 was error. The principal flaw in this argument is that the record does not support the plaintiff's contention that defendants' instruction No. 13 was given. Plaintiff as appellant had the burden of filing with this court a sufficient record for us to make a determination of the issues. (*Maborn v. Moyers* (1975), 26 Ill. App. 3d 231, 233.) Plaintiff has not filed a report of proceedings, or any permissible substitute therefore, of the judge's reading of the instructions to the jury, and, therefore, we have no direct record before us of what instructions were actually read.

Our examination of the instructions contained in the common law record was not helpful. While we did find a copy of defendants' instruction No. 13, the original of that instruction, which ordinarily would have gone to the jury, is not included. The notations on the copy in the record are ambiguous in that there are notations which would indicate that the instruction was to be given as well as notations that it would not be given.

The report of proceedings of the conference on jury instructions is not ambiguous and discloses that, while the trial judge understandably vacillated as to which version of IPI Civil No. 15.01 he would give, he eventually, and in no uncertain terms, advised the parties that he would not give plaintiff's instruction No. 11 because he found it to be confusing, but he would give a modified version of defendants' instruction No. 13 that would use the word "any" in lieu of the word "a" in the first sentence of IPI Civil No. 15.01 if requested to do so by plaintiff. Plaintiff thereupon requested that it be done, and defendant thereupon withdrew both of his versions of IPI Civil No. 15.01, which he had offered as defendants' instructions No. 13 and 14. While there is some confusion still remaining because neither the original nor a copy of this modified instruction is contained in the common law record, we do conclude from an examination of the record that the trial court did give IPI Civil No. 15.01 in a modified form which read as follows:

"When I use the expression 'proximate cause', I mean any cause which, in natural or probable sequence produced the injury complained of."

■ The court did not err in giving this version of IPI Civil No. 15.01. It in no way suggests to the jury that they are limited to a determination of a single cause for plaintiff's injuries. The evil which plaintiff perceived in defendants' instruction No. 13 is not present in this instruction.

Further, even if we were to assume *arguendo* that the trial court did give the instruction in the form suggested by plaintiff on appeal, we would find the error to be harmless.

■ The purpose of instructions is to convey to the minds of the jurors the correct principles of law applicable to the evidence submitted to them. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1019.) The proper approach in considering the propriety of an instruction is whether the instructions when considered as a whole were sufficiently clear so that the jury was not misled. *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 646.

■ In this case, at the request of the plaintiff, a burden of proof instruction was given which included the proposition to be proved "that the negligence of the defendant was *a* proximate cause of the injury to the plaintiff" (emphasis added) (IPI Civil No. 21.02). Of more importance, and also at the request of plaintiff, the court gave IPI Civil No. A10.03 (spec. supp. 1981), which defined both contributory and comparative negligence and instructed the jury that plaintiff's contributory negligence, if any, would not bar her recovery, but that the total amount of damages to which she would otherwise be entitled would be reduced in proportion to the amount of her negligence. In addition, verdict form No. 45.06 for judgment in favor of plaintiff called for the jury to assume "that 100% represents the total combined negligence of the plaintiff and of the defendant" and for a finding as to "the percentage of negligence that was a proximate cause of plaintiff's injury attributable solely to the plaintiff." The proximate cause instruction, even given in the form contended by the plaintiff, considered in combination with all the other instructions given the jury would not have misled them but adequately instructed the jury that they were to consider both defendants' conduct and plaintiff's conduct as to proximate causes of the injury. Taken as a whole and regardless of which of the contested forms of the proximate cause instruction was given, the jury was instructed adequately as to the issues and the applicable law, and there is no reversible error herein. *Marshall v. Metropolitan Life Insurance Co.* (1950), 405 Ill. 90; *Sphatt v. Tulley* (1962), 38 Ill. App. 2d 229.

■ Plaintiff next contends on appeal that the admission of witness Ferestad's testimony regarding the condition of defendants' premises constituted reversible error because the witness admitted in his deposition and at trial that he could not describe the condition of the defendants' front yard during the first week of November 1978 and that this error was given impact by the conduct of the trial judge in personally questioning the witness. Plaintiff argues that Ferestad did not actually observe the property through his own senses at or near the time of the occurrence (McCormick, Evidence sec. 10, at 20 (2d ed. 1972)) and therefore had no personal knowledge upon which to base his testimony regarding a fact of consequence in the litigation (E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 601.1, at 229 (3d ed. 1979)). His testimony, according to plaintiff, consisted of impermissible vague impressions (*Rounds v. McCormick* (1882), 11 Ill. App. 220).

Basically, plaintiff's objection is based upon the premise that testimony concerning the condition of the yard should have been limited to the date of the fall or a short period immediately preceding the fall. However, one of the critical factual issues in this case was the existence or nonexistence of a worn path. A reasonable inference could be drawn that if a worn path existed, it would have existed for some period of time.

Ferestad testified that no such pathway existed during the entire fall season. The basis for this testimony was established by his testimony that he observed the property several times a week during that time. The facts that he actually set foot on the property only every few months, that he could not recall being on the property during October, November or December 1978, and that he could not specifically recall the condition of the property in the first week of November 1978 affect the weight to be afforded his testimony, not its admissibility. Ferestad's testimony was relevant and properly admitted.

Regarding the judge's comments during the testimony to which plaintiff takes exception, it is clear that the trial judge intervened in order to move the trial along and clarify the testimony. The court properly refrained from expressing an opinion concerning Ferestad's credibility or the weight to be accorded his testimony, and the judge's remarks were not of such a nature as would ordinarily create prejudice in the minds of the jury. The trial judge was trying to clarify the testimony of the witness, and there appears to have been no prejudicial error in so doing. *Bebb v. Yellow Cab Co.* (1970), 120 Ill. App. 2d 454, 465-67, and cases cited therein; 37 Ill. L. & Prac. *Witnesses* sec. 87 (1958).

■ Finally, plaintiff argues on appeal that the court committed re-

versible error in admitting evidence regarding her prior medical problems. She maintains that generalized evidence of diabetic symptoms was improperly allowed to come in despite the fact that she testified that she was symptom-free for three months prior through three months after the fall. She also contends, in substance, that evidence about her medical problems and symptoms up to six years prior to her fall was not relevant since such evidence would not establish a causal relationship between these problems and her fall.

However, plaintiff testified that she was receiving Social Security disability payments for low blood pressure (postural hypotension) from 1975 through the time of the fall, although her doctor did note that she had no postural hypotension problem in his notes in August 1978. Also, she stated that she sometimes had shooting pains in her legs from 1975 through the date of the fall, even though she had stated in her deposition that she had no left leg problem prior to the fall. While her doctor testified that her diabetes was "fairly well controlled" in August 1978, he said at trial that the dizziness and pains in the legs do not reduce in intensity in accordance with the amount of control of diabetes even though he had written in his report in August 1978 that the leg pain was so affected.

Most damaging to plaintiff's position, however, was her doctor's testimony that it was possible that she could have had these problems between the two times that he saw her, August 1978 and February 1979. She alleged and had the burden of proving that her fall resulted from defendants' negligence; evidence that a long-standing medical condition might have caused her to teeter and fall has obvious relevance and probative value. (See *Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 508.) The fact that her testimony contradicted that cause and that there was impeachment of both plaintiff and her doctor affects the weight to be accorded the testimony, not its admissibility. 37 Ill. L. & Prac. *Witnesses* sec. 236 (1958).

The judgment of the trial court is affirmed.

Affirmed.

REINHARD and HOPF, JJ., concur.